IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES BAILEY, | ) | CASE NO. 1:18-cv-02790 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff James Bailey ("Plaintiff" or "Bailey") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

On August 26, 2016, Bailey protectively filed[1] an application for SSI.[2]  Tr. 15, 91-96. Bailey alleged an onset date of May 1, 1990.  Tr. 15, 110.  Bailey later amended his alleged onset date to August 26, 2016.  Tr. 15, 110.  He alleged disability based on schizophrenia, shoulder

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 11/5/2019).

[2] Bailey had previously filed an application for SSI on September 9, 2011.  Tr. 10.  That application was denied in a decision dated June 25, 2013.  Tr. 15, 25-41.

pain, HIV (human immunodeficiency virus), arthritis of the knee, and sleep apnea.  Tr. 50, 61, 67, 116.  After initial denial by the state agency (Tr. 61-63) and denial upon reconsideration (Tr. 67-68), Bailey requested a hearing (Tr. 69).  On December 22, 2017, a hearing was held before an Administrative Law Judge ("ALJ").  Tr. 1620-1673.

On January 24, 2018, the ALJ issued an unfavorable decision (Tr. 12-24), finding that Bailey had not been under a disability within the meaning of the Social Security Act since August 26, 2016, the date the application was filed and the amended alleged disability onset date (Tr. 16, 24).  In reaching her decision, the ALJ considered the prior June 25, 2013, decision but completed her own review in light of there being new and material evidence showing a significant change in Bailey's condition since the amended alleged onset date of August 26, 2016.  Tr. 15.  Bailey requested review of the ALJ's decision by the Appeals Council. Tr. 11.  On October 30, 2018, the Appeals Council denied Bailey's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 5-8.

## II. Evidence

### A.      Personal, educational, and vocational evidence

Bailey was born in 1970.  Tr. 1627.  He was 47 years old at the time of the December 22, 2017, hearing.  Tr. 1627.  Bailey completed school through the tenth grade.  Tr. 1627.  He never received his GED.  Tr. 1627-1628.  He attended Jobs Corp but was terminated after he was involved in an altercation.  Tr. 1628.  Bailey has three adult children who live out of state.  Tr. 1652.  Bailey talks to his children on occasion but has not seem them since his oldest child was around three years old.  Tr. 1652.  Bailey could not accurately recall past jobs or length of time that he worked past jobs.  Tr. 1633-1639.  The ALJ found that Bailey had no past relevant work.

Tr. 23.  Bailey has been incarcerated twice, once in 1993 for six months, and once in 2006 for six months.  Tr. 1647-1648.

**B.      Medical evidence**

    **1.      Treatment history**

        **a.      Mental health impairments**

On January 13, 2016, Bailey was seen for a mental health assessment at Connections.  Tr. 178-188.  Rachelle Spitz, a social worker, conducted the assessment.  Tr. 178, 188.  Bailey had previously received treatment at Frontline from 2010 through March 2015 but, when he tried to resume treatment at Frontline, he was referred out because he was no longer homeless.  Tr. 178.  Bailey had stopped taking his medications, which included Seroquel, Effexor, and Trazadone, three months earlier because he wanted to be "normal" and not have to take medications.  Tr. 178.  Bailey was also taking medication for his HIV.  Tr. 178, 186.  He tested positive for HIV eight years earlier but the virus was undetectable.  Tr. 186.  Bailey relayed three prior psychiatric hospitalizations – twice when he was in his 20s and once when he was in his 30s.  Tr. 182, 186.  Bailey had his own place through CMHA but he was staying with his mother because he had hurt his back a number of weeks earlier.  Tr. 178.  His mother indicated that Bailey needed to get back on his medications or he could not stay with her because he was paranoid – he thought the roof was going to collapse in on him and that people were plotting against him.  Tr. 178, 184.  Bailey had problems with using crack in the past.  Tr. 178.  He relapsed in February 2015 but had been clean since September 2015.  Tr. 178.  Bailey reported a history of sexual abuse when he was a child.  Tr. 183.  Ms. Spitz diagnosed Bailey with schizophrenia and moderate cocaine stimulant use disorder.  Tr. 187.  She recommended a referral to psychiatry.  Tr. 187-188.

On February 16, 2016, Bailey saw Linda Kimble, an APN (Advanced Practice Nurse) at Connections for an initial psychiatric evaluation. Tr. 189-194.  On mental status examination, Nurse Kimble observed no idea/intent/plan to harm self or others; Bailey's appearance was normal; his build was thin; his demeanor was distrustful; he had normal eye contact, activity, and speech; his thought process was circumstantial and racing, with flight of ideas; his thought content was phobic, obsessional, grandiose, guilty, guarded, and persecutory; visual and auditory hallucinations were noted along with illusions; his mood was depressed, anxious, and angry; his affect was full and constricted; his behavior was cooperative; his cognition was normal; his intellect was above normal; and his insight and judgment were fair. Tr. 190-191.  Bailey was tearful at times during the interview. Tr. 192.  Nurse Kimble diagnosed schizophrenia and moderate cocaine stimulant disorder, noting no use since September 2015. Tr. 193.  That same day, Bailey met with Aleksandar Simic, RN. Tr. 195-197.  Nurse Simic reviewed Bailey's medications with him and stressed the importance of medication and appointment compliance. Tr. 197.

Bailey also met with Darcia Boyd in February 2016 for case management services.  Tr. 808-810, 811-813, 814-816.  Bailey saw Ms. Boyd again on March 2, 2016, (Tr. 817-819), and March 14, 2016, (Tr. 820-822).  During the March 2, 2016, visit, Bailey was interested in admission to a residential drug treatment facility (Tr. 818) and, during the March 14, 2016, visit Ms. Boyd noted that Bailey was scheduled to begin residential treatment the following day (Tr. 821).  During each of the visits, Ms. Boyd noted that Bailey was functioning well.  Tr. 809, 810, 815, 818, 821.

Bailey saw Nurse Simic on April 12, 2016.  Tr. 198-200.  During that visit, Nurse Simic noted normal appearance, build, demeanor, eye contact, activity, and speech; logical thought

process; persecutory thought content; auditory hallucinations; flat affect; and a cooperative

behavior.  Tr. 199-200.  Bailey also saw Nurse Kimble on April 12, 2016.  Tr. 867-870.  Bailey

had gone to residential treatment but did not stay 30 days because CMHA was going to paint his

apartment and he did not want them in his apartment.  Tr. 867.  Bailey indicated his medications

were helping but some of the side effects were not good.  Tr. 867.  He relayed having two

episodes when he ran out of the building because of things he was hearing.  Tr. 867.  Bailey had

a lot of anxiety and anger.  Tr. 867.  Nurse Kimble noted no change in Bailey's mental status

examination since his last visit.  Tr. 867.

Bailey saw Ms. Boyd on April 26, 2016 (Tr. 823-824), and on June 1, 2016 (Tr. 825-

827).  Ms. Boyd noted that Bailey had completed residential treatment and was functioning well.

Tr. 824, 826.  During the June 1, 2016, visit, Ms. Boyd noted that Bailey was medication

compliant and was no longer experiencing symptoms since he was taking his medication and

completed the substance abuse program.  Tr. 826.

During a June 7, 2016, visit with Nurse Kimble (Tr. 210-212), Bailey indicated that he

felt his medications were working but his mother had told him he was a little more irritable and

angry than usual.  Tr. 210.  Bailey was having a lot of back pain following an accident that

occurred in November.  Tr. 210.  He also had arm pain, bad knees, and HIV.  Tr. 210.  Some of

the side effects from his medications were not good.  Tr. 210.  His side effects included thirst/dry

mouth, nausea/heartburn, constipation, headaches, and insomnia.  Tr. 210.  Bailey was concerned

that his memory was getting worse.  Tr. 210.  Bailey's appetite was improved, his depression and

lack of motivation were worse when he was alone.  Tr. 210.  He had anxiety and was noticeably

rocking.  Tr. 210.  Bailey's hallucinations were mainly auditory, not visual.  Tr. 210.  He had

thoughts of hurting people but no plan to do so.  Tr. 210-211.  Bailey reported being clean for

three months and he was attending AA when he was able to.  Tr. 210.  Nurse Kimble noted no change in Bailey's mental status examination since his last visit.  Tr. 211.

Bailey saw Nurse Kimble on August 4, 2016.  Tr. 214-216.  Bailey had been very sad since his last visit due to his addiction, feelings of rejection, and having HIV.  Tr. 214.  Bailey's anger was bad – he was having outbursts almost daily over small things.  Tr. 214.  Bailey had used cocaine the month prior.  Tr. 214.  Bailey was not sleeping well due to his shoulder pain.  Tr. 214.  His hallucinations were primarily auditory and had last occurred about six weeks earlier.  Tr. 214.  He reported suicidal/homicidal ideations a couple times each week but thinking of his mother stopped him and he tried not to entertain those thoughts.  Tr. 214.  Medication side effects included thirst/dry mouth and headaches.  Tr. 214.  Nurse Kimble made some adjustments to Bailey's medications, including stopping Trazadone because she thought it might be causing Bailey's headaches.  Tr. 215.  Nurse Kimble wanted Bailey to continue seeing Ms. Boyd for case management services and recommended that he consider counseling.  Tr. 215.  Nurse Kimble noted no change in Bailey's mental status examination since his last visit.  Tr. 215.

Bailey continued to see or speak with Ms. Boyd from June 2016 through November 2016.  Tr. 828-856.  Ms. Boyd noted that Bailey expressed some concern/frustration over his living situation, reapplying for social security, and being on probation.  Tr. 840, 842, 845, 850, 852. However, Ms. Boyd continued to note that Bailey appeared to be functioning well.  Tr. 828-856.

When Bailey saw Nurse Kimble on December 16, 2016, Bailey was on probation and had been back and forth to court.  Tr. 759-761.  He risked returning to prison if he relapsed.  Tr. 759.  Bailey was not taking his medication regularly and he had stretched them out until he ran out that

day.  Tr. 759.  Bailey's sleep was better but he was continuing to have racing thoughts and he was hearing things.  Tr. 759.  Bailey was feeling a little down – he was not really a holiday guy. Tr. 759.  Bailey had not been very angry but he was still having outbursts over little things.  Tr. 759.  He was trying to distance himself from things that set him off because he was fearful of getting into trouble.  Tr. 759.  He had some suicidal ideation, explaining that, if he thinks the building is going to come down on him, he feels like he needs to jump.  Tr. 759.  Thinking of his mother stopped his suicidal thinking.  Tr. 759.  Bailey complained that his shoulder had gotten worse and it ached all day.  Tr. 759.  Nurse Kimble noted no change in Bailey's mental status since the last visit.  Tr. 759.  She encouraged him to take his medications as prescribed and to consider counseling.  Tr. 760.

Bailey saw Nurse Kimble on January 4, 2017.  Tr. 762-765.  Bailey was still on probation.  Tr. 762.  Bailey was taking his medications as prescribed.  Tr. 762.  He was sleeping better but still having racing thoughts and hearing things in his building.  Tr. 762.  He was trying to find another place to live.  Tr. 762.  Bailey's appetite was good; he was a little down; he had anxiety; and he was having outbursts – yelling and being verbally abusive – but trying to stay to himself so he did not get into trouble or hurt someone.  Tr. 762.  Nurse Kimble noted no change in Bailey's mental status since the last visit.  Tr. 763.  Nurse Kimble completed a form to help Bailey try to get a larger apartment.  Tr. 763.

Bailey saw Nurse Kimble on February 3, 2017.[3]  Tr. 766-769.  He was upset about the living conditions at the residential treatment facility he was at.  Tr. 766.  He had signed himself out and was planning on staying with his mother.  Tr. 766.  Bailey reported being compliant with his medications.  Tr. 766.  He was sleeping about five hours, with some fatigue in the morning.

---

[3] As discussed below, Nurse Kimble completed a medical source statement on February 3, 2017.  Tr. 521-522.

Tr. 766.  Bailey was having a hard time concentrating/focusing and he was having racing thoughts.  Tr. 766.  He was irritable and getting angry over little things but trying to avoid conflict.  Tr. 766.  Bailey had not had hallucinations while staying at the treatment facility.  Tr. 766-767.  He did not have suicidal ideation but had thoughts of wanting to hurt someone over the prior two days.  Tr. 767.  He reported no opiates or alcohol since November 2016.  Tr. 767.  Bailey relayed that he had received a cortisone shot in his shoulder and it was feeling a little better.  Tr. 767.  Nurse Kimble noted no change in Bailey's mental status since the last visit.  Tr. 768.

On March 26, 2017, Bailey sought emergency room treatment for near syncope.  Tr. 1305.  He was standing outside his building when his legs gave out and he fell to the ground.  Tr. 1305.  Bailey reported recent stress relating to a relationship that had ended when he informed his significant other of his HIV status.  Tr. 1305.  She posted the information on social media.  Tr. 1305.  Bailey had not used crack for 68 days but relapsed 5 days prior to his fainting episode in connection with the stress pertaining to his relationship issues.  Tr. 1305.  During his emergency room visit, Bailey was cooperative, he had a normal affect, and a linear thought process.  Tr. 1306.  Bailey was discharged home in stable condition.  Tr. 1307.

Bailey saw Nurse Kimble on March 30, 2017.  Tr. 886-889.  During that visit, Bailey requested a referral to anger management classes.  Tr. 886.  Bailey's sleep was getting better.  Tr. 886.  He was limiting his coffee.  Tr. 886.  He was having racing thoughts but they were not as bad.  Tr. 886.  His mood was described as "irritable, fatigued, angry and little things tick him off."  Tr. 886.  He was depressed; had anxiety; and was having some flashbacks.  Tr. 886.  His hallucinations had lessened, e.g., he had two over the prior three weeks whereas he had been having them a couple of times per week.  Tr. 886.  He had some suicidal/homicidal ideation but

no plan.  Tr. 886.  Nurse Kimble increased some of Bailey's medications for his anxiety, depression, hallucinations, and flashbacks.  Tr. 886.  However, Nurse Kimble continued to note no change in Bailey's mental status since the last visit.  Tr. 887.

When Bailey saw Nurse Kimble on May 25, 2017, he relayed that he had a relapse in April; told his probation officer he had used; went to jail for one day; and then went to get help at Matt Talbot[4] for inpatient treatment.  Tr. 890.  Bailey's mood was pretty irritable but he was working on it.  Tr. 890.  He reported a lot of built up anger and felt that he was pushing people away.  Tr. 890.  He was having a lot of ups and downs.  Tr. 890.  Nurse Kimble continued to note no change in Bailey's mental status since the last visit.  Tr. 891.

On July 20, 2017, Bailey saw Nurse Kimble.  Tr. 1499-1501.  He was going to his meetings, isolating himself in his apartment, and trying to stay out of trouble and not use.  Tr. 1499.  Bailey relayed that he cried at night, about two or three times each week, due to the joy he felt in not using.  Tr. 1499.  Bailey had received approval for a change in his apartment but had not yet moved.  Tr. 1499.  His mother visited him three or four times each week.  Tr. 1499.  Bailey was still on probation.  Tr. 1499.  He had finished at Matt Talbot.  Tr. 1499.  He reported having some flashbacks.  Tr. 1499.  His moods would come and go – he was trying to avoid confrontation and drugs; he was still angry, depressed and had anxiety; and having hallucinations when in his apartment.  Tr. 1499.  His appetite was too good.  Tr. 1499.  Bailey had gained 30 pounds since his last visit.  Tr. 1499.  Nurse Kimble did not complete the mental status examination portion of the treatment notes.  Tr. 1500-1501.

---

[4] Matt Talbot "[p]rovides alcohol and drug addiction treatment[.]"  *See* https://ccdocle.org/program/matt-talbot-for-recovering-men (last visited 11/5/2019); *see also* https://ccdocle.org/program/matt-talbot-inn (last visited 11/5/2019).

Bailey saw Nurse Kimble the following month on August 24, 2017.  Tr. 1502-1504.
Nurse Kimble noted that Bailey continued to be depressed and anxious.  Tr. 1503.  He was
having hallucinations about the building falling, some improvement in his nightmares, and
occasional flashbacks.  Tr. 1503.  Bailey was waiting for his new apartment; not attending as
many meetings; and isolating to himself.  Tr. 1503.  Without specific details noted, Nurse
Kimble indicated that there was a change in Bailey's mental status since his last visit.  Tr. 1503.

Bailey also continued to see or speak with Ms. Boyd from December 22, 2016, through at
least September 13, 2017.  Tr. 857-866, 1495-1498, 1507-1508.  During these visits, Ms. Boyd
continued to indicate that Bailey was functioning well.  Tr. 857-866, 1495-1498, 1507-1508.
During the May 22, 2017, visit, Ms. Boyd noted that Bailey was in a residential treatment
program and on probation.  Tr. 865.  Bailey enjoyed being in the program and planned on
successfully completing it.  Tr. 865.  In August and September 2017, Ms. Boyd indicated that
Bailey had missed some appointments.  Tr. 1507.

On October 6, 2017, Bailey saw Nurse Kimble.  Tr. 1509-1511.  Bailey relayed that he
had recently moved into an eight-unit apartment building.  Tr. 1509.  Bailey requested a letter in
support of his request for social security and a letter so he could try to get permission for a pet in
his apartment.  Tr. 1509.  He was a little depressed because his friends were now across town but
there was a library across the street.  Tr. 1509.  He was glad to move and felt very good about the
neighborhood.  Tr. 1509.  He had recently learned to make smoked turkey and black-eyed peas.
Tr. 1509.  Bailey was still on probation until September 2018 but had finished at Matt Talbot and
graduated from intensive outpatient treatment.  Tr. 1509.  Bailey had joined a church and had
started volunteering at a food pantry.  Tr. 1509.  His mood was still up and down.  Tr. 1509.  He
found himself snapping at people but not having outbursts.  Tr. 1509.  Due to a lack of

transportation Bailey was not having visitors.  Tr. 1509.  Bailey's uncle was planning on

bringing his mother over that weekend to help him unpack.  Tr. 1509.  He had not had any panic

since his move but had three instances before his move.  Tr. 1509.  Bailey reported having

hallucinations and he remained paranoid.  Tr. 1510.  He continued to be depressed and anxious

with some improvement in his nightmares and occasional flashbacks.  Tr. 1510.  Nurse Kimble

indicated she wrote letters regarding social security and a pet.  Tr. 1510.  She offered to refer

Bailey to counseling but he refused.  Tr. 1511.  Nurse Kimble noted no change in Bailey's

mental status since the prior visit.  Tr. 1511.

During an office visit with Melissa Jenkins, M.D., for follow up regarding his HIV on

October 21, 2017, Bailey relayed that he had been doing well with his recovery and had been

clean for six months.  Tr. 1574.  His mental health was better than his prior visit.  Tr. 1575.  He

was continuing to have anxiety at night but he was stable.  Tr. 1575.  He relayed that he was

continuing his treatment at Connections and his medications had remained the same except there

had been an increase in the dose of one of his medications.  Tr. 1575.  Dr. Jenkins observed a

normal affect, euthymic mood, appropriate insight and intact judgment.  Tr. 1576.  She noted

Bailey's diagnoses of schizophrenia and depression but indicated that Bailey was stable on his

current medication regimen.  Tr. 1578.

### b.  Physical impairments

Bailey received treatment for his physical impairments through MetroHealth Medical

Center.  In early February 2016, Bailey was involved in a motor vehicle accident while riding as

a backseat passenger.  Tr. 254.  The accident aggravated prior neck, back and arm pain.  Tr. 254,

616.  During a February 11, 2016, physical therapy appointment about a week after the accident,

Bailey reported that he was still having symptoms between his shoulder blades and down his

right side.  Tr. 254.  He felt stiffer since the accident.  Tr. 254.  He was unable to sit still to watch a movie.  Tr. 254.  Bailey had an appointment scheduled with physical medicine and rehabilitation ("PM&R" or pain management) following his physical therapy appointment.  Tr. 254-255.  The physical therapist, Barbara Tingley, noted that Bailey's range of motion was worse than it was when he was last seen in physical therapy.  Tr. 255.  She encouraged Bailey to perform repeated cervical retraction exercises.  Tr. 255.

During his visit with Nurse Ann Harrington in the PM&R department on February 11, 2016, Bailey relayed that his neck, upper back and arm pain started in November 2015 when he was struck in his upper back with a 2x4 that was blown off a house by the wind.  Tr. 256.  The physical examination findings were essentially normal with the exception of decreased range of motion and pain in the cervical spine.  Tr. 259.   Nurse Harrington advised Bailey to continue taking Meloxicam; she increased the Gabapentin dose; and she added Flexeril to Bailey's medications.  Tr. 259.  She advised Bailey to obtain the cervical spine x-rays that had been previously ordered and to continue with physical therapy.  Tr. 259.

Bailey saw Nurse Harrington in PM&R in March and June 2016.  Tr. 228.  During those visits, Bailey complained of neck pain that radiated down into his right arm, right flank pain that was worse with activity and walking, thoracic back pain, and pain over his right shoulder that radiated into the "intrascapular region and the upper right [t]rap" and caused difficulty with abduction and reaching.  Tr. 228.  Bailey had an MRI performed of his right shoulder in June 2016 that showed a rim tear.  Tr. 228, 232, 239.

On July 20, 2016, Bailey was seen by James Kryiakedes, M.D., in orthopaedics for his right shoulder pain.  Tr. 231-233.  Dr. Kryiakedes noted that Bailey had received a lidocaine injection in his right shoulder by PM&R that provided him with great relief for 12 hours.  Tr.

231.  Dr. Kryiakedes noted the MRI findings.  Tr. 232.  Dr. Kryiakedes concluded that surgical intervention was not warranted.  Tr. 233.  Considering the relief that Bailey received from the lidocaine injection, Dr. Kryiakedes administered a cortisone steroid injection, which Bailey tolerated well.  Tr. 233.  Dr. Kryiakedes recommended that Bailey continue with physical therapy and follow up with PM&R for a repeat injection in three months.  Tr. 233.

During an August 4, 2016, visit with Nurse Harrington, Bailey reported that the cortisone steroid injection helped for 10 days.  Tr. 228.  He was not doing home exercises.  Tr. 228.  He was taking Gabapentin, Relafen, and Tizandidine, which he felt helped.  Tr. 228. Nurse Harrington indicated that Bailey's upper intrascapular spine and right shoulder pain was consistent with right shoulder impingement syndrome.  Tr. 230.  Flexeril did not help Bailey so Nurse Harrington started Bailey on Zanaflex.  Tr. 230.  She advised Bailey to continue taking Gabapentin.  Tr. 230.  Nurse Harrington noted that a thoracic spine x-ray was within normal limits and Bailey's physical examination was essentially normal except there was decreased range of motion and pain in the cervical spine.  Tr. 230.  A cervical spine x-ray looked good with mild loss of lordosis.  Tr. 230.  Nurse Harrington recommended lidocaine injections because steroids were contraindicated with Norvir (Bailey's HIV medication).  Tr. 230.

Bailey attended physical therapy for his right shoulder impingement.  Tr. 221-226. During physical therapy visits in August 2016 (Tr. 223-226) and September 2016 (Tr. 221-223), Bailey noted difficulty with taking his shirts/jackets on and off and pain with overhead reaching (Tr. 222, 226).  During the September 7, 2016, physical therapy session, Ms. Tingley noted that Bailey had progressed with scapular strengthening exercises; his range of motion had improved – more fluid motion; he still had some pain at end-range of shoulder flexion and some pain through arc.  Tr. 222-223.

Bailey saw Nurse Harrington again in PM&R on January 25, 2017.  Tr. 1219-1225. Bailey reported that he was not interested in taking Gabapentin, Relafen, or Zanaflex because he felt that those medications combined with his HIV medications made him "goofy."  Tr. 1221. He was not interested in physical therapy and just wanted an injection.  Tr. 1221.  Nurse Harrington administered a right shoulder injection and ordered a compound cream.  Tr. 1221. Gabapentin, Relafen, or Zanaflex were discontinued.  Tr. 1221.

On February 13, 2017, Bailey sought treatment at the emergency room for pain in both knees that he had been having for two or three days.  Tr. 1231.  Bailey had tried ice and ibuprofen with moderate relief.  Tr. 1231.  Bailey reported having similar pain in the past but it was worse over the prior two days.  Tr. 1231.  Physical examination findings were unremarkable. Tr. 1232.  The emergency room physician suspected osteoarthritis and recommended that Bailey continue to treat his pain with ibuprofen.  Tr. 1233.  Bailey was agreeable to the recommendation and he was discharged with a prescription for ibuprofen and voltaren gel and with instructions to follow up with ortho and PM&R for further management.  Tr. 1233.

On February 14, 2017, Bailey was involved in a motor vehicle accident while riding as a passenger on a bus.  Tr. 894.  He sought emergency room treatment that day, complaining of right hip and low back pain.  Tr. 894.  Bailey fell forward and landed on his lower back when a vehicle hit the bus he was riding on.  Tr. 894.  Following the accident, Bailey reported he was able to get up and ambulate.  Tr. 894.  A thoracic spine x-ray showed mild multi-level discogenic degenerative changes without evidence of an acute fracture or subluxation and, x-rays of the lumbosacral spine and bilateral hips showed no fracture, dislocation, or subluxation.  Tr. 895-896.  Bailey was discharged with a prescription for ibuprofen and advised to rest, avoid heavy lifting and to ice his back.  Tr. 896.

14

Two days later, on February 16, 2017, Bailey saw Aundrea Stevenson, M.D., in internal medicine at MetroHealth with complaints of headaches and pain on the right side of his body. Tr. 1249.  Bailey was observed to be in moderate distress but alert and cooperative.  Tr. 1249.  Physical examination showed a normal gait, normal and symmetric reflexes, sensation grossly intact, no motor deficits, full range of motion in the neck with no tenderness, and normal range of motion in the back.  Tr. 1249-1250.  Dr. Stevenson administered a Toradol injection, prescribed Fioricet and advised Bailey to follow up with his primary care physician.  Tr. 1250.

On February 27, 2017, Bailey saw Heather Rainey, M.D., in the PM&R department.  Tr. 1274-1279.  Bailey complained of low back pain, which he had not had until he was in the accident while riding a bus.  Tr. 1274.  Bailey described his pain, indicating it was localized across his low back and mid back, to the right hip.  Tr. 1274.  His pain radiated from the hip to the low back; the pain was sharp; and the pain was worse with walking and sitting in one position.  Tr. 1274.  Bailey's pain was better with switching positions.  Tr. 1274.  Dr. Rainey diagnosed lumbar strain and acute bilateral low back pain without sciatica.  Tr. 1279.  Dr. Rainey referred Bailey to physical therapy; instructed him to stop taking ibuprofen and to start Mobic; instructed him to take Tizanidine as needed for pain; and she recommended an x-ray of the spine. Tr. 1279.

Bailey had a physical therapy evaluation on February 28, 2017.  Tr. 1284-1287.  The physical therapist Timothy Walsh found decreased range of motion, decreased strength, decreased sensory, tender points, dysfunctional joint mobility, decreased functional skills and complaints of pain.  Tr. 1286.  Mr. Walsh recommended 10 physical therapy session, 1-2 times per week, and indicated that Bailey's prognosis was good.  Tr. 1287.

Bailey saw Nurse Sirey on April 18, 2017, for a refill of his headache medication.  Tr. 1358-1362.  Bailey relayed that his headaches occurred a few times each month and resolved after taking Fioricet.  Tr. 1360.  Bailey was requesting a new physical therapy referral, indicating he had been discharged because of no shows.  Tr. 1360.  He indicated he had transportation problems.  Tr. 1360.  Bailey relayed he had injured his right knee, which was improved.  Tr. 1360.  Physical examination findings included no swelling or redness in the right knee; some diffuse tenderness of the lumbar region; no impairment in gait or range of motion.  Tr. 1362.  Nurse Sirey refilled Bailey's Fioricet and provided him with a physical therapy referral.  Tr. 1362.

On April 26, 2017, Bailey saw Nurse Harrington for a right shoulder injection.  Tr. 1378-1383.  Bailey had good relief for nine weeks from the injection he had in January 2017.  Tr. 1379.  He was trying to eliminate medications and had stopped taking Zanaflex and Gabapentin but was using a compound cream.  Tr. 1379.  Nurse Harrington noted that Bailey was seeing Dr. Rainey for his back pain.  Tr. 1379.  Nurse Harrington administered an injection in Bailey's right shoulder.  Tr. 1382-1383.

A May 23, 2017, x-ray of Bailey's lumbar spine showed mild degenerative disease at L1 and L2.  Tr. 1398.  Otherwise, the x-ray was unremarkable.  Tr. 1398.

On June 16, 2017, upon referral of his primary care provider, Michelle Sirey, CNP, Bailey saw Albert Coreno, PA-C, in the pulmonary department at MetroHealth for an evaluation of obstructive sleep apnea.  Tr. 1412-1418.  Bailey had a history of obstructive sleep apnea since at least May 2012.  Tr. 1412.  Mr. Coreno ordered a sleep study to assess for sleep apnea.  Tr. 1417.

Upon Nurse Sirey's referral, on July 18, 2017, Bailey had an EMG performed for evaluation of carpal tunnel. Tr. 1439-1440. The EMG was of the right and left upper extremities but it was more limited on the left. Tr. 1440. The EMG was suggestive of (1) bilateral median mononeuropathies at or distal to the wrists (consistent with bilateral carpal tunnel syndrome) – mild to moderate in degree with no evidence of recent or ongoing nerve fiber loss on the right (where it was sought); and (2) right ulnar mononeuropathy – very mild in degree with no evidence of recent or ongoing nerve fiber loss. Tr. 1440. There was no evidence of superimposed right cervical radiculopathy. Tr. 1440.

In July 2017, Bailey saw Nurse Harrington for an injection in his right shoulder. Tr. 1427, 1441-1446.

A July 31, 2017, sleep study indicated moderate to severe sleep apnea that warranted treatment. Tr. 1450-1454.

On August 2, 2017, Bailey returned to physical therapy for his back pain. Tr. 1486-1489. He saw physical therapist Raymond Lumpkin. Tr. 1489. The therapist noted that Bailey had tried physical therapy earlier in the year but legal troubles caused him to stop attending. Tr. 1486. Bailey indicated that his low back pain radiated down towards his rectum. Tr. 1487. He indicated that his pain worsened when stepping off a curb or bending and it improved with medication and rest. Tr. 1487. Bailey reported urinary urgency/incontinence since his bus accident. Tr. 1488. Mr. Lumpkin noted limited trunk range of motion, core weakness, and hypomobility of the upper lumbar spine. Tr. 1488. Mr. Lumpkin felt that Bailey's presentation was likely a combination of right SI dysfunction and upper lumbar disc disorder. Tr. 1488. Mr. Lumpkin recommended physical therapy one time per week for five weeks. Tr. 1489. Bailey attended physical therapy from August through September 13, 2017. Tr. 1532-1557. On

September 13, 2017, Bailey reported improvement with physical therapy.  Tr. 1556.  Mr. Lumpkin indicated that Bailey had improved abdominal strength and lumbar range of motion. Tr. 1557.  Bailey was discharged from physical therapy with a home exercise plan.  Tr. 1557.

On October 11, 2017, Bailey saw Daniel Quinones, M.D., at the Orthopaedic Hand Clinic for follow up regarding the EMG results that showed mild-moderate bilateral carpal tunnel syndrome.  Tr. 1562.  Bailey had soreness in his hands but denied paresthesias.  Tr. 1562.  Dr. Quinones administered carpal tunnel injections but noted the physical examination findings were not in agreement with the EMG findings so further testing might be useful.  Tr. 1564.  Dr. Quinones recommended follow up in one month for reevaluation.  Tr. 1564.

### 2.  Opinion evidence

#### a.      Mental impairments

*Treating medical provider*

On February 3, 2017, Nurse Kimble completed a Medical Source Statement: Patient's Mental Capacity.  Tr. 521-522.  In that statement, Nurse Kimble offered her opinion regarding Bailey's ability to perform work-related abilities in 22 categories.  Tr. 521-522.  The available ratings were constant, meaning "ability to perform activity is unlimited;" frequent, meaning "ability for activity exists up to 2/3 of work day;" occasional, meaning "ability for activity exists for up to 1/3 of a work day;" and rare, meaning "activity cannot be performed for any appreciable time."  Tr. 521.

Nurse Kimble opined that Bailey could (1) constantly maintain his appearance; (2) frequently work in coordination with or in proximity to others without being distracting; understand, remember and carry out simple instructions; relate predictably in social situations; and leave home on his own; (3) occasionally follow work rules; use judgment; maintain regular

attendance and be punctual within customary tolerance; interact with supervisors; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember and carry out detailed but not complex job instructions; socialize; behave in an emotionally stable manner; and manage funds/schedules; and (4) rarely maintain attention and concentration for extended periods of 2-hour segments; respond appropriately to changes in routine settings; deal with the public; relate to coworkers; function independently without redirection; work in coordination with or proximity to others without being distracted; deal with work stress; and understand, remember and carry out complex job instructions.  Tr. 521-522. When asked to identify any diagnosis or symptoms that supported her assessment, Nurse Kimble listed a diagnosis of schizophrenia.  Tr. 522.  At the time Nurse Kimble completed the statement, she had been seeing Bailey for one year and last saw him on the date she completed the statement.  Tr. 522.

*State agency reviewers*

Upon reconsideration,[5] on March 22, 2017, state agency reviewing psychologist Paul Tangeman, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 770-784) and Mental RFC Assessment (Tr. 785-788).  In the PRT, Dr. Tangeman identified impairments of schizophrenia and other psychotic disorders and affective disorder but did not find that Bailey's impairments satisfied listing criteria for Listings 12.03 or 12.04.  Tr. 772-773.  Dr. Tangeman opined that Bailey had moderate limitations in his ability to understand, remember, or apply information; marked limitations in his ability to interact with others; moderate limitations in his

---

[5] As part of the initial review, on October 13, 2016, state agency reviewing psychologist Carl Tishler, Ph.D., concluded that there was insufficient evidence to evaluate the claim, noting that several attempts were made to contact Bailey regarding his mental health issues but Bailey had not responded.  Tr. 54.

ability to concentrate, persist, or maintain pace; and moderate limitations in his ability to adapt or manage oneself.  Tr. 782.

In the Mental RFC, Dr. Tangeman found that Bailey could "perform simple, routine tasks so long as work is considered low stress, no high production quotas and done on a piece rate basis, no arbitration, negotiations, confrontations with others and work involving supervising others[;] engage in superficial interactions with coworkers but can't interact with public."  Tr. 787.  Dr. Tangeman's Mental RFC was an adoption of the RFC from the prior June 25, 2013, ALJ decision.  Tr. 787.

### b.    Physical impairments

On October 1, 2016, state agency reviewing physician Gail Mutchler, M.D., completed a Physical RFC Assessment.  Tr. 55-57.  Dr. Mutchler opined that Bailey had the RFC to occasionally lift/carry 50 pounds and frequently lift/carry 25 pounds; he could stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; his ability to push/pull with his right upper extremity would be limited to frequent due to right shoulder pain strength 4/5; and his ability to reach overhead with the right upper extremity would be limited to frequent due to right shoulder pain strength 4/5 and reduced range of motion.  Tr. 55-56.

Upon reconsideration, on February 24, 2017, state agency reviewing physician Linda Hall, M.D., completed a Physical RFC Assessment.  Tr. 751-758.  Dr. Hall's RFC was an affirmation of Dr. Mutchler's RFC.  Tr. 55-56, 751-758.

### C.    Hearing testimony

### 1.    Plaintiff's testimony

Bailey testified and was represented at the hearing.  Tr. 1622, 1626-1665.   Bailey lives alone in an apartment.  Tr. 1626.  His mother comes over for two or three days each week to help

20

him as far as his medication and with cooking.  Tr. 1626-1627.  Bailey's mom will come over on a Tuesday and leave on a Friday.  Tr. 1627, 1657-1658.  His mom will prepare meals for him, which he will freeze.  Tr. 1627.  Bailey's mom has been showing him how to use a crockpot.  Tr. 1650.  He and his mom are really close – she is his best friend.  Tr. 1649, 1650.  Bailey explained that his HIV medications and mental health medications cause fatigue.  Tr. 1626, 1658-1659.  One time, he fell asleep while he was cooking and his apartment caught on fire.  Tr. 1626, 1658.  Also, he explained that his mental health medications cause constipation, diarrhea, and dry mouth.  Tr. 1658-1659, 1661.  Bailey indicated that he takes 16 pills every day.  Tr. 1661.

Bailey is able to take care of his apartment, except he cannot mop.  Tr. 1648-1650.  Bailey can go shopping for groceries but indicated he was not good at it, explaining that he will forget the things he was supposed to buy, e.g., bread.  Tr. 1650-1651.  Bailey does not have a driver's license.  Tr. 1629.  When he was 16 years old, he was driving a car and caused a really bad accident.  Tr. 1629.  His license was suspended and he never got it back.  Tr. 1629.

Bailey was not employed.  Tr. 1629-1630.  Bailey has left jobs and not returned because he cannot handle being around a lot of people.  Tr. 1656.  One time, Bailey was terminated from a job when he had a visual and auditory hallucination and ran out of work.  Tr. 1655-1656.  Bailey explained he has a bad phobia about things coming down on him and he thought he saw and heard the walls cracking and he thought the building was going to come down.  Tr. 1655-1656.  He still continues to experience hallucinations even when he is in his own apartment.  Tr. 1656-1657.  Bailey also has memory problems.  Tr. 1663.

Bailey has volunteered at the food pantry at his dad's church.  Tr. 1630.  He volunteers about once a month for a three-hour shift.  Tr. 1630.  He puts food into bags that people come and pick up.  Tr. 1630.  Bailey's dad is an active member in the church and tries to get Bailey out

of the house.  Tr. 1630.  Bailey estimated lifting about 20 pounds when he volunteers.  Tr. 1632-1633.  When Bailey volunteers, he works alone.  Tr. 1631-1632.  Bailey has problems being around a lot of people.  Tr. 1631.  Bailey gets into a lot of altercations.  Tr. 1659-1660.  They are mostly verbal but, one time, while he was at Jobs Corps, the altercation turned physical.  Tr. 1659.

When the ALJ asked Bailey to summarize why he felt he was unable to work full time, Bailey indicated he was not a people person – he does not do well with everyday communication with other people.  Tr. 1639.  Bailey indicated he has trust issues, especially with males due to things that have happened in his life.  Tr. 1639, 1664.  Also, his multiple medications make him very tired.  Tr. 1640.  Bailey has struggled with addiction but had been clean since June of 2017.  Tr. 1640.  With assistance from his psychiatrist, he was able to move out of a large 16-story CMHA housing unit with a lot of chaos to a smaller – 8-unit apartment – with mostly seniors.  Tr. 1641.  That move has helped him stay clean.  Tr. 1641.

In addition to not wanting to be around people and his medication side-effects, physically, Bailey has constant aches in his shoulder due to a tear in his shoulder and a dull ache in his lower back.  Tr. 1641-1642.  Bailey indicated that he has been told that the tear in his shoulder is not large enough to require surgery but his shoulder problems make it difficult for him to perform day-to-day activities, which is why his mom comes over to help him.  Tr. 1642, 1662.  For his shoulder, every three months, Bailey receives a shot and he has received therapy.  Tr. 1644-1645.  Bailey received his last shot in his shoulder the month before the hearing.  Tr. 1645.  Bailey has received therapy for his back and takes muscle relaxers.  Tr. 1644-1645.

Also, Bailey's left knee causes him problems – it sometimes buckles on him.  Tr. 1642.  He had knee surgery in 2010 and had therapy for it.  Tr. 1644, 1662.  After his surgery, he was in

a bus accident that aggravated his knee injury which required additional therapy.  Tr. 1644, 1662-1663.

While Bailey's HIV diagnosis does not limit him physically, it affects him mentally.  Tr. 1642.  He feels he can never have a normal life, e.g., a companion in his life.  Tr. 1642-1643.  He has crying spells daily.  Tr. 1660.  He has a lot of emotional build up, anger, and stress over what happened to him.  Tr. 1660-1661.  Bailey described his mental health symptoms as stable provided he remains compliant with his medications.  Tr. 1664.  He has crazy thoughts at times and sees the face of the individual who abused him for a long time.  Tr. 1664.

Bailey has carpal tunnel syndrome in both wrists.  Tr. 1645-1646.  He recently started receiving shots in his wrists for his carpal tunnel.  Tr. 1646-1647.   At the time of the hearing, Bailey had received his first shots about eight weeks before the hearing.  Tr. 1646.  Sometimes, Bailey's hands lock up on him and his is unable to move his hands at all.  Tr. 1663.  Bailey's doctors have told him that he will eventually need surgery on his hands.  Tr. 1646-1647, 1663.

During the day, Bailey watches a lot of news, he listens to music, and he goes to the library which is across the street from his apartment.  Tr. 1653.  He borrows movies from the library.  Tr. 1653.  Bailey explained that his days are very long day but he is "grateful to see it." Tr. 1653-1654.  When his mom visits, they play dominoes and card games.  Tr. 1654.  His uncle, who is his mom's youngest brother, visits sometimes as well.  Tr. 1654.  His best days of the week are when his mom visits him.  Tr. 1654.

### 2.    Vocational expert's testimony

Vocational Expert Brett Salkin ("VE") testified at the hearing.  Tr. 176, 1665-1671.  The ALJ explained that there was no past relevant work and asked the VE to consider an individual of Bailey's age, education and work experience who could perform a full range of medium work

and who could frequently push and pull using hand controls with the right upper extremity; frequently reach overhead with the right upper extremity; frequently handle and finger bilaterally; perform simple, routine tasks so long as the work is considered low stress, that is work that does not involve high production quotas and work that is not done on a piece rate basis, and work that does not involve the ability to engage in arbitration, negotiation or confrontation with others; and does not involve supervising others; and can engage in superficial interactions with coworkers but cannot interact with members of the public.  Tr. 1666-1667.  The VE indicated that the described individual could perform the following jobs: (1) cleaner; (2) janitor; and (3) warehouse worker.  Tr. 1667.  The VE provided national job incidence data for each of the identified jobs.  Tr. 1667.  The VE testified further that, in order to sustain competitive employment, an individual could be off task no more than 10% of the time.  Tr. 1668.

Bailey's counsel asked the VE to consider the ALJ's first hypothetical except the individual could stand and walk a total of four hours in an eight-hour workday and could only occasionally handle and finger bilaterally.  Tr. 1669.  The VE indicated that, with those modifications, there would be no jobs available.  Tr. 1669.  Bailey's counsel asked the VE to consider the ALJ's first hypothetical except that there could be no contact with coworkers, including proximity to them, and no greater than 10% contact with supervisors in an unskilled setting.  Tr. 1670.  The VE indicated that there would be no work available.  Tr. 1670.  Bailey's counsel then asked the VE whether there would be jobs available to a hypothetical worker who had no exertional limitations but who could have no contact, including proximity, to men.  Tr. 1670.  The VE indicated that there would be no jobs available.  Tr. 1670.  The VE further testified that the tolerance for absenteeism in the unskilled setting was no more than one day per

24

month, noting that the tolerance for absenteeism in the unskilled setting is even less during a probationary period.  Tr. 1670-1671.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her January 24, 2018, decision, the ALJ made the following findings:[6]

1.      Bailey has not engaged in substantial gainful activity since August 26, 2016, the application date. Tr. 17.

2.      Bailey has the following severe impairments: HIV, osteoarthritis and allied disorders, schizophrenia and other psychotic disorders, bilateral carpal tunnel syndrome, and spine disorders.  Tr. 17-18.

3.      Bailey does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  Tr. 18-19.

4.      Bailey has the RFC to perform the following: lift, carry, push, and pull twenty-five pounds frequently and fifty pounds occasionally, stand/walk six hours and sit six hours of an 8-hour workday; frequently push/pull and use hand controls with the right upper extremity; frequently reach overhead with the right upper extremity; frequently handle/finger bilaterally; can perform simple, routine tasks so long as work is considered low stress (meaning work that does not involve high production quotas, work that is not done on a "piece rate" basis, work that does not involve the ability to engage in arbitration, negotiations, or confrontations with others, and work that does not involve supervising others); and he can engage in superficial interactions with co-workers; however, he cannot interact with members of the public.  Tr. 19-23.

---

[6] The ALJ's findings are summarized.

5.      Bailey has no past relevant work. Tr. 23.

6.      Bailey was born in 1970 and was 46 years old, defined as a younger individual age 18-49, on the date the application was filed.  Tr. 23.

7.      Bailey has a limited education and is able to communicate in English.  Tr. 23.

8.      Transferability of job skills is not an issue because Bailey does not have past relevant work.  Tr. 23.

9.      Considering Bailey's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Bailey can perform, including cleaner, janitor, warehouse worker.  Tr. 23-24.

Based on the foregoing, the ALJ determined that Bailey had not been under a disability, as defined in the Social Security Act, since August 26, 2016, the date the application was filed. Tr. 24.

## V. Plaintiff's Arguments

Bailey argues: (1) the ALJ erred when she assigned only "some weight" to the opinion of her treating nurse practitioner, Nurse Kimble; and (2) the ALJ did not adequately assess her credibility and symptoms.  Doc. 12, pp. 1, 11-16.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**A.**     **The ALJ did not err with respect to Nurse Kimble's opinion**

Bailey argues that the ALJ committed reversible error when she assigned only "some weight" to the opinion of his treating nurse, Nurse Kimble.  Doc. 12, pp. 11-14.  In presenting this argument, Bailey also asserts that the RFC limitations do not adequately reflect limitations identified by Nurse Kimble and state agency reviewing psychologist Dr. Tangeman.  *Id.*

For claims like Bailey's that are filed prior to March 27, 2017, the regulations define a "treating source" as a claimant's "own acceptable medical source" who "provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. §416.927(a)(2).  Further, for claims filed prior to March 27, 2017, "acceptable medical source" includes licensed physician, licensed psychologist, licensed optometrist but does not include licensed advanced practice registered nurse or social worker.  20 C.F.R. § 416.902(a).  Since Nurse Kimble is not an

"acceptable medical source," she is not a "treating sources" subject to controlling weight analysis under the treating physician rule.  *See e.g., Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997) (treating chiropractor was an "other source," not an "acceptable medical source" within meaning of regulation, thus ALJ has discretion to determine appropriate weight to accord chiropractor's opinion based on all evidence in record).

Nevertheless, the opinion of a medical source who is not an "acceptable medical source" who has seen a claimant in her professional capacity is relevant evidence.  SSR 06-03p, 2006 WL 2329939, * 6 (August 9, 2006).   And, SSR 06-03p provides guidance as to how opinions of medical sources who are not "acceptable medical sources" are to be considered, stating,

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources' [and] [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or a subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p, 2006 WL 2329939, * 6.

Here, consistent with the regulations, while Nurse Kimble is not an "acceptable medical source," the ALJ considered her opinion and explained the weight assigned to it, stating:

> The claimant's counselor, Linda Kimble, APN, completed a medical source statement on February 3, 2017 (Exhibit B7F).  Ms. Kimble concluded that the claimant can "rarely" maintain attention and concentration for extended periods of 2 hour segments, respond appropriately to changes in routine settings, deal with the public, relate to co-workers, function independently without redirection, deal with work stress, or understand, remember, and carry out complex job instructions.  I give some weight to the conclusions of Ms. Kimble.  While the above evidence of record documents limitations related to severe schizophrenia, the conclusions of the claimant's counselor are vague with regard to the claimant's residual functional capacity despite such limitations.

Tr. 23.

The ALJ did not fail to consider the opinion of Ms. Kimble, a medical source who is not an acceptable medical source, as the ALJ did in *Craddock v. Colvin*, 2015 WL 4664006 (N.D. Ohio Aug. 6, 2015), which Bailey cites in support of his argument that the ALJ committed reversible error with respect to the opinion of Nurse Kimble.  Doc. 12, p. 13.  Moreover, the ALJ explained why only "some weight" was assigned to Nurse Kimble's opinion, which contained very extreme limitations.  Tr. 23.

The ALJ explained her reason for discounting Nurse Kimble's opinion, i.e., the ALJ found Nurse Kimble's conclusions were vague.  Bailey contends that this finding is in conflict with Nurse Kimble's evaluations, which he contends were not vague and detailed symptoms, diagnoses, and limitations.  Doc. 12, p. 13.  However, the ALJ did not ignore Bailey's mental health impairments or treatment history.  Tr. 18, 21-22.  Furthermore, what the ALJ was weighing was Nurse Kimble's February 3, 2017, opinion.  That opinion is a two-page check-box style opinion that lists only Bailey's diagnosis of schizophrenia in the section asking for a diagnosis <u>and</u> symptoms that support the assessment.  Tr. 522.  In light of the lack of supporting detail included in Nurse Kimble's opinion, Bailey has not demonstrated that the ALJ's decision to assign only "some weight" to the opinion because Nurse Kimble's conclusions were vague is not supported by the record.

Moreover, the RFC contains various mental limitations, including significant limitations on interaction with others, e.g., only superficial interaction with coworkers and no interaction with the public.  Tr. 20.  Also, the ALJ limited Bailey to simple, routine work that is low stress (meaning work that does not involve high production quotas, work that is not done on a "piece rate" basis, work that does not involve the ability to engage in arbitration, negotiations, or confrontations with others, and work that does not involve supervising others).  Tr. 19-20.

Bailey contends that these limitations are not sufficient to account for moderate limitations in concentration, persistence or pace and/or the limitations that Nurse Kimble and state agency reviewing psychologist Dr. Tangeman found Bailey had in the areas of concentration, persistence and pace and interaction with others.

While the ALJ did not find that Bailey's limitations were as extreme as those Nurse Kimble included in her February 3, 2017, opinion, the ALJ took into account Bailey's schizophrenia and symptoms related thereto when formulating the RFC. Tr. 18, 21-22. And, as discussed herein, Bailey has not shown error with respect to the ALJ's decision to assign "some weight" to Nurse Kimble's opinion. Thus, his attempt to argue that the RFC was flawed because it did not include more restrictive limitations as opined by Nurse Kimble is without merit.

Furthermore, Dr. Tangeman found that Bailey could "perform simple, routine tasks so long as work is considered low stress, no high production quotas and done on a piece rate basis, no arbitration, negotiations, confrontations with others and work involving supervising others[;] engage in superficial interactions with coworkers but can't interact with public." Tr. 787. The ALJ assigned "great weight" to Dr. Tangeman's opinion (Tr. 18, 22) and the limitations contained in the RFC formulated by the ALJ are consistent with those contained in Dr. Tangeman's RFC (Tr. 19-20, 787). Thus, Bailey's contention that the RFC is not consistent with or not supported by Dr. Tangeman's opinion is also without merit. Moreover, Bailey has not challenged the weight assigned to Dr. Tangeman's opinion.

Additionally, as the Sixth Circuit has observed, "Case law in this Circuit does not support a rule that a hypothetical providing for simple, unskilled work is *per se* insufficient to convey moderate limitations in concentration, persistence and pace." *Kepke v. Comm'r of Soc. Sec.*, 636 Fed. Appx. 625, 635 (6th Cir. 2016) (unpublished). And Bailey has not shown that, because

there was evidence of moderate limitations in concentration, persistence or pace, mental limitations, more restrictive than simple, routine tasks that are considered low stress, were required.  As discussed herein, the ALJ considered and weighed the opinion evidence and considered the other evidence of record.  Having done so, the ALJ formulated the RFC and Bailey has not shown that the RFC is not supported by substantial evidence.

Based on the foregoing, the undersigned recommends that the Court find that the ALJ did not err with respect to the weighing of Nurse Kimble's opinion and that Bailey has not shown that the RFC limitations are unsupported by the record.

## B.      The ALJ did not err in her evaluation of Bailey's credibility or symptoms

A claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability.  20 C.F.R. § 416.929(a); SSR 16-3p, 2017 WL 5180304.[7]  When a claimant alleges impairment-related symptoms, a two-step process is used to evaluate those symptoms.  20 C.F.R. § 416.929(c); 2017 WL 5180304, * 2-8.

First, a determination is made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, *e.g.*, pain.  SSR 16-3p, 2017 WL 5180304, * 3-4.  Second, once the foregoing is demonstrated, an evaluation of the intensity and persistence of the claimant's symptoms is necessary to determine the extent to which the symptoms limit the claimant's ability to perform work-related activities.  *Id.* at * 3, 5-8.  To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence.  SSR 16-3p, 2017 WL 5180304, * 5-8.  In addition to this evidence, the factors set

---

[7] SSR 16-3p replaces SSR 96-7p and applies to rulings on or after March 28, 2016.  *See* 2017 WL 5180304, at *1, 13.

forth in 20 C.F.R. 416.929(c)(3) are considered.  *Id.* at *7-8.  Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms.  *Id.*  The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  *Id*. at * 10.

"An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

Bailey argues that the ALJ did not properly evaluate his credibility and symptoms because she did not adequately address Bailey's fatigue and sleep disorder symptoms, lethargy, hand pain and limits, and his hallucinations and phobias.  Doc. 12, pp. 15-16.  In presenting his argument, Bailey cites to various portions of the administrative record to show evidence of medication side effects; fatigue; difficulty or inability to use his hands; hallucinations and phobias; anger and stress; and memory problems.  Doc. 12, p. 16 (citing various portions of the administrative record).   While Bailey contends that there is substantial evidence to support his

claim that his symptoms are disabling, (Doc. 12, p. 15), the ALJ, having considered the entirety

of the record, found otherwise.  And, even if substantial evidence or indeed a preponderance of

the evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached

by the ALJ." *Jones*, 336 F.3d at 477.

Additionally, Bailey argues that Nurse Kimble's treatment and opinion support his

testimony.  Doc. 12, p. 16.  However, as discussed above, the ALJ considered that evidence but

concluded that Bailey was not as limited as Nurse Kimble opined.  Furthermore, the ALJ did not

ignore evidence regarding Bailey's symptoms of the alleged disabling effect of those symptoms.

Tr. 20.  For example, the ALJ discussed and considered Bailey's claims of tiredness, difficulty

with writing due to pain in his wrists, hallucinations and paranoia, altercations with others,

evidence that his mother came over to his home to cook for him. Tr. 18, 20, 21, 22.

More particularly, when assessing the evidence of record, the ALJ considered evidence

that Bailey's mental impairments were generally stable on medication but that Bailey was not

always compliant with his medication.  Tr. 18, 21.  Further, there was evidence that Bailey

exhibited improvement with treatment and finding a support group.  Tr. 22.  The ALJ considered

evidence pertaining to Bailey's trust issues, anger and instances of altercations with others.  Tr.

18, 21-22.  The ALJ also considered evidence of activities, including evidence that Bailey

volunteered at a food pantry, went to his local library and attended AA meetings.  Tr. 18, 22.

And, although the ALJ concluded that Bailey's mental health symptoms were not as disabling as

he alleged, the ALJ included restrictive limitations in the mental RFC, including only superficial

interaction with coworkers and no interaction with the public.  Tr. 20.

Also, the ALJ considered evidence regarding bilateral carpal tunnel syndrome but noted that a physical examination in October 2017 was not consistent with the EMG findings and an examination in June 2017 showed full strength in the hands and arms.  Tr. 21.  Notwithstanding this evidence, considering evidence of bilateral carpal tunnel syndrome, the ALJ included manipulative limitations that were more restrictive than those included in the opinions of the state agency reviewing physician, i.e., the ALJ included a limitation of frequently handling/fingering bilaterally.  Tr. 22.

In sum, Bailey disagrees with the ALJ's finding that Bailey's symptoms were not as disabling as he alleged.  However, the ALJ's decision makes clear that the ALJ fully considered the record and assessed Bailey's subjective statements regarding the disabling effects of his symptoms.  And, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner,* 745 F.2d at 387.  Having reviewed the ALJ's decision and considering that an ALJ's credibility assessment is to be accorded great weight and deference, the undersigned finds that the ALJ's credibility analysis regarding the severity of Bailey's mental and physical impairments is supported by substantial evidence. Accordingly, even if other evidence were shown to support Bailey's position, reversal and remand is not warranted.   *Jones*, 336 F.3d at 477 (Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ.").

Based on the foregoing, the undersigned recommends that the Court find that the ALJ did not err when she evaluated Bailey's credibility and his symptoms.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.

November 5, 2019

*/s/ Kathleen B. Burke*
_____

Kathleen B. Burke
United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).